IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **EDGAR MARTINEZ,** | : CIVIL ACTION NO. 1:20-CV-1826 |
| Plaintiff | : |
| v. | : (Judge Conner)[1] |
| **KEVIN RANSOM, DR. SCOTT PRINCE, and LEA MARTIN,** | : |
| Defendants | : |

# MEMORANDUM

Plaintiff Edgar Martinez, an inmate at the State Correctional Institution in Dallas, Pennsylvania (SCI Dallas), filed this *pro se* action asserting constitutional tort claims under 42 U.S.C. § 1983 and medical malpractice under Pennsylvania law. Martinez alleges Section 1983 claims for Eighth Amendment deliberate indifference to serious medical needs against SCI Dallas's superintendent, one of its doctors, and its healthcare administrator. Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Martinez's constitutional claims. For the reasons that follow, we will grant defendants' Rule 56 motions.

---

[1] This case was previously assigned to the Honorable John E. Jones III. It was transferred to the undersigned shortly after Judge Jones' retirement from the federal bench on August 1, 2021.

I.     **Factual Background**[2]

Martinez's claims are grounded in the medical care he received at SCI Dallas in 2019 and the first half of 2020.  (See generally Doc. 1-2[3]; Doc. 24 ¶ 3).  He contends that defendants Lea Martin—a healthcare administrator—and Dr. Scott Prince were deliberately indifferent to his serious medical needs.  (Doc. 1-2 ¶¶ 20, 29, 30, 42, 43, 46-48).  He further alleges that superintendent Kevin Ransom is liable under Section 1983 because Ransom was aware of this constitutionally deficient medical treatment and took no corrective action.  (Id. ¶¶ 22, 34, 37-39).  It appears that Martinez also seeks to pursue state-law medical malpractice claims against Martin and Dr. Prince in his complaint, although the pleadings in this regard are undeveloped.  (See id. ¶ 3 (stating that Martinez "is asserting a professional liability claim against" Dr. Prince); Doc. 1-3 at 6, 7 (certificates of merit for Martin and Dr.

---

[2] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (Docs. 19, 24, 26).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the Rule 56.1 statements.  Martinez has only responded to the Rule 56.1 statement filed by Martin and Ransom.  (See Doc. 26).  Accordingly, Dr. Prince's Rule 56.1 statement, (Doc. 24), will be deemed admitted unless plainly contradicted by the record.  See LOCAL RULE OF COURT 56.1.

[3] Martinez verified his complaint under penalty of perjury.  (Doc. 1-2 at 9).

Prince for professional liability action as required by PA. R. CIV. P. 1042.3(a)); see also Doc. 29 at 2 ¶ 3).

The Rule 56 record establishes the following facts. At all times relevant to the instant lawsuit, Martinez has been incarcerated at SCI Dallas. (See generally Doc. 1-2). Martinez has suffered from back-related medical issues for more than 15 years. (Doc. 1-2 ¶ 5; Doc. 19 ¶ 1). The acute medical problems that underlie the instant litigation began around mid-2019. (Doc. 24 ¶ 11).

On July 19, 2019, Martinez complained to nursing staff of significant right lower abdominal pain and right-sided back pain, as well as nausea. (Id.) He was treated by medical staff and underwent a urinalysis, which revealed the presence of blood in his urine. (Id.) Martinez was given a differential diagnosis of a kidney stone, admitted to the infirmary for observation, and prescribed Tylenol for his pain. (Id.) That same day, medical staff ordered a kidney, ureter, and bladder (KUB) x-ray to assess Martinez for possible kidney stones, scheduling the test for July 22. (Id. ¶ 13).

The following day, Martinez reported that he was doing better and not experiencing any acute discomfort. (Id. ¶ 14). Nurses continued to monitor him that day until he was released back to his housing unit. (Id. ¶ 15). As planned, on July 22, Martinez underwent the KUB x-ray, which showed essentially normal results. (Id. ¶ 16). The radiologist recommended an ultrasound or CT scan if problems persisted or if there was concern for kidney stones. (Id.)

Martinez's right flank pain continued, and he was seen again by medical staff on July 25. (Id. ¶ 17). During this sick call, Martinez was informed that his KUB x-ray results were negative for kidney stones, but a dipstick urinalysis indicated that he still had blood in his urine. (Id.) Medical staff explained that an ultrasound would be ordered and Martinez was instructed to return for care as needed or if his symptoms worsened. (Id.; Doc. 24-1 at 56). Authorization for a July 30 KUB ultrasound was requested that same day, which Dr. Prince promptly approved. (Doc. 24 ¶ 18).

On July 29, Martinez was seen by nursing staff for similar complaints of right back and abdomen pain. (Id. ¶ 19). The next day, as scheduled, he underwent the scheduled KUB ultrasound, which showed bilateral hydronephrosis and suspected right renal stones. (Id. ¶ 21; Doc. 24-1 at 103).

On August 7, during a sick call for unrelated eye and hand issues, Martinez inquired about the results of the July 30 ultrasound. (Doc. 24 ¶ 22). He was told that the test showed bilateral hydronephrosis and possible right kidney stones, and that next steps would be discussed with Dr. Prince. (Id.) Two days later, medical staff requested authorization for an August 28 CT scan of the abdomen and pelvis, which Dr. Prince and another doctor approved that same day. (Doc. 24-1 at 85).

The August 28 CT scan of the abdomen and pelvis was performed as scheduled and showed that Martinez had two small renal cysts and a 4-millimeter

4

bladder calculus (or stone) near the "ureterovesical junction" (UVJ),[4] but no kidney stones. (Doc. 24 ¶ 24; Doc. 24-1 at 101). The next day, Dr. Prince saw Martinez for a follow-up appointment and informed him of the test results, in particular that he had a bladder stone at the UVJ that Dr. Prince believed would pass on its own. (Doc. 24 ¶ 25). Dr. Prince instructed Martinez to report any persistence of pain beyond another month and also noted that Martinez's degenerative disc disease may be contributing to the flank pain. (Id.)

The next time Martinez reported kidney symptoms was during a sick call on November 8, 2019. (Id. ¶ 28). Martinez expressed worsening, intermittent kidney pain over the preceding three to four months but was unsure if he had passed the UVJ stone. (Id.) A dipstick urinalysis during this visit was unremarkable. (Id.) The attending physician assistant prescribed Motrin as needed, noting that Martinez's flank pain may have a muscular component. (Id.)

Martinez was next seen by medical staff on March 23, 2020. (Id. ¶ 29). During this sick-call visit, he complained of continuing dull, intermittent pain in his bilateral kidney region. (Id.; Doc. 24-1 at 27). A dipstick urinalysis showed no blood or infection. (Doc. 24-1 at 28). The attending physician assistant recommended using Tylenol for pain and notified Martinez that his lipids were elevated. (Doc. 24 ¶ 29). The physician assistant also ordered a follow-up KUB x-ray and lipid panel, and further requested a consult for an on-site renal and bladder ultrasound. (Id.

---

[4] The ureterovesical junction is located where the ureter, draining urine from the kidney, connects to the bladder. See https://www.chop.edu/conditions-diseases/ureterovesical-junction-uvj-obstruction (last visited Jan. 12, 2022).

¶ 30). Dr. Prince approved the ultrasound approximately 11 minutes later. (Doc. 24-1 at 83).

The KUB x-ray was performed on March 26 and again was essentially normal. (Doc. 24 ¶ 31). The ultrasound on March 31, however, showed an enlarged prostate, moderate postvoid residual bladder volume, mild bilateral hydronephrosis that was worse in the left kidney, but no evidence of stones. (Id. ¶ 32).

On April 6, SCI Dallas medical staff reviewed Martinez's lab work, which showed continued elevated lipids. (Id. ¶ 33; Doc. 24-1 at 26). Martinez was seen on April 10 at his cell, at which time the nurse practitioner relayed her concerns about his elevated cholesterol levels and the concomitant cardiovascular risks, strongly recommending that Martinez begin statin therapy. (Doc. 24-1 at 23-24). Martinez expressed disinterest in his lipid levels, remarking that he could not "care less" about his cholesterol, declining to take statin medication, and laughing at the nurse practitioner's health warnings. (Doc. 24-1 at 23-24). Martinez was then provided a "release from responsibility for medical treatment" regarding his refusal to treat his elevated lipids. (Id. at 25). Because SCI Dallas was on lockdown, he was not able to physically sign the form, but did provide verbal acknowledgment of his refusal for this treatment. (Id.)

Martinez next treated for kidney pain on a May 6, 2020 sick call. (Doc. 24 ¶ 36). He saw Dr. Prince, who noted that Martinez denied "any dysuria, hesitancy, frequency, [or] nocturia," but was more concerned with the flank pain he was experiencing. (Doc. 24-1 at 19). Dr. Prince performed this sick-call visit on

6

Martinez's housing block due to the lockdown at SCI Dallas for the Covid-19 pandemic. (Id.) Dr. Prince prescribed ibuprofen for pain and Flomax for "BPH" (benign prostatic hyperplasia), noting that Martinez would need a digital rectal exam when the lockdown at SCI Dallas ended. (Id.; Doc. 24 ¶ 36).

Martinez filed two grievances related to his 2019 and early 2020 medical care, both of which were denied. (See Doc. 21-5 at 2; Doc. 21-9 at 2). He then filed suit in the Court of Common Pleas of Luzerne County, Pennsylvania, on August 16, 2020.[5] (Doc. 1-2). Defendants removed the case to this Court pursuant to 28 U.S.C. § 1441(a). (See Doc. 1 ¶ 4). Defendants now move for summary judgment. (Docs. 18, 22). They seek judgment as matter of law as to all federal claims asserted against them, but do not discuss the state-law medical malpractice claims. (See generally Docs. 18, 18-1, 20, 22, 22-1, 23, 28). The Rule 56 motions are ripe for disposition.

## II. Legal Standard

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(a). The burden of proof is on the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P.

---

[5] The complaint is time stamped as filed on August 26, 2020, (see Doc. 1-2 at 2), but Martinez dated, signed, and verified his complaint on August 16, 2020, (see id. at 8-9).

7

56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(a), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

### III. Discussion

Defendants contend that Martinez cannot carry his Rule 56 burden on any of his constitutional tort claims. Martin and Ransom raise a bevy of reasons why the claims against them fail as a matter of law, including lack of personal involvement, qualified immunity, failure to exhaust administrative remedies, statute of limitations, and failure to show deliberate indifference. (See Doc. 20 at 2). Dr. Prince focuses on the merits of the Eighth Amendment medical care claim, arguing that the undisputed facts demonstrate that he was not deliberately indifferent. (Doc. 23 at 4-17). We find that Martinez's Section 1983 claims fail for several reasons.

#### A. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 (PLRA), 42 U.S.C. § 1997e *et seq.*, requires prisoners to exhaust available administrative remedies before suing prison officials for alleged constitutional violations. See id. § 1997e(a); Ross v. Blake, 578 U.S. 632, 639, 642 (2016) (explaining that only "available" remedies must be exhausted). Proper exhaustion is mandatory, even if the inmate is seeking relief—

like monetary damages—that cannot be granted by the administrative system.  See Woodford v. Ngo, 548 U.S. 81, 85 (2006).  The exhaustion process a prisoner must follow is governed by the contours of the prison grievance system in effect where the inmate is incarcerated.  Jones v. Bock, 549 U.S. 199, 218 (2007); see also Woodford, 548 U.S. at 90-91.

Pennsylvania's Department of Corrections (DOC) employs a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases.  See Booth v. Churner, 206 F.3d 289, 292 n.2 (3d Cir. 2002); COMMONWEALTH OF PA., DEP'T OF CORR., INMATE GRIEVANCE SYS., Policy No. DC-ADM 804 (May 1, 2015) (hereinafter "DC-ADM 804").  If informal resolution attempts do not resolve the problem, the first step is to file a written grievance (using form DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based."  DC-ADM 804 § 1(A)(3)-(5).  An adverse decision by the grievance coordinator may be appealed to the Facility Manager within 15 working days of the initial-review response or rejection.  Id. § 2(A)(1).  Finally, the decision of the Facility Manager may be appealed to "Final Review" with the Secretary's Office of Inmate Grievances and Appeals (SOIGA), and again must be submitted within 15 working days of the date of the Facility Manager's decision.  Id. § 2(B)(1).

The DOC has specific requirements for grievances submitted by inmates.  Those requirements include, among other things, that the grievance "be legible [and] understandable"; "include a statement of the facts relevant to the claim" as

9

well as "the date, approximate time, and location of the event(s) that gave rise to the grievance"; that the prisoner "identify individuals directly involved in the event(s)"; and that the grievance include "the specific relief sought," including "compensation or other legal relief normally available from a court." Id. § 1(A)(11).

Martinez filed three grievances related to his medical treatment at SCI Dallas. (See Doc. 21-6 at 2-3). The first grievance—number 724223—was filed in March 2018. (See Doc. 21-6 at 2; Doc. 1-2 at 11-17). None of the allegations in Martinez's complaint reference this grievance or the healthcare issues complained of therein; rather, the earliest date of wrongful conduct alleged in the complaint is 2019. (See generally Doc. 1-2 at 2-8). In this grievance, Martinez complained that, *inter alia*, he waited four days for a sick-call response and a "Ms. Loretta" did not properly address his concerns of stomach pain and allergies. (Doc. 21-4 at 9). None of the defendants in this lawsuit are named in the grievance, nor did any named defendant take part in the review or appeal process. (See generally Doc. 21-4). Martinez fully exhausted grievance number 724223 to the SOIGA, but again, it is irrelevant to the claims and defendants in this litigation.

Martinez next filed grievance number 819297 on August 14, 2019. (Doc. 21-9 at 4). He complained that, after being seen by SCI Dallas medical staff for chronic pain, the staff ordered x-rays, an ultrasound, and a CT scan. (Id.) He further asserted that he had been told that Dr. Prince would contact him after the testing to inform him of a diagnosis, but that he was never contacted. (Id.) After waiting for "days" and suffering from pain, he put in a sick-call request, and during the sick-

10

call visit was told that the ultrasound showed that he had kidney stones and blood in his urine. (Id.) He additionally claimed that he was waiting to see Dr. Prince, had not yet been seen by him, and that an unidentified nurse had "forgot about" him. (Id.) Martinez alleged that he was "being subjected to medical mal-practice at the hands of the Heath Care staff" and by Martin, and he sought treatment and monetary damages. (Id.)

Initial review of this grievance was conducted by grievance officer "S. Miller" on September 5, 2019. (Id. at 2-3). Miller denied Martinez's grievance, explaining that he had contacted Martin, who had informed him that Martinez was seen by medical staff approximately one week after the ultrasound and CT Scan. (Id.) The grievance officer further noted that Martinez was seen by Dr. Prince on August 29, 2019, one day after the CT Scan was completed, and had been informed of the test results. (Id.) Martinez did not appeal this initial denial. (See Doc. 21-8 ¶¶ 6-7; Doc. 27 at 9).

Finally, Martinez filed grievance number 862879 on April 12, 2020. (Doc. 1-2 ¶ 17; Doc. 1-2 at 19). In this grievance, he complained that an unidentified doctor had told him in November 2019 that an x-ray would be ordered, but this x-ray had not been completed until March 2020 after Martinez complained that he was still waiting for the study. (Doc. 1-2 at 19). He further alleged that, after it was performed, he had been "waiting for 14 day[s] for the results" of the x-ray, had not been able to sleep because of the pain, and had not been prescribed "a single pain

11

killer." (Id.) According to Martinez, these issues reflected "negligence" in his medical care. (Id.)

Martin was assigned as the grievance coordinator for review of this grievance. (See id. at 20). In her April 30, 2020 initial grievance response, Martin explained that the KUB x-ray was performed on March 26, 2020, showed essentially normal results, and thus required no follow up. (Id.) She further noted that Martinez saw an SCI Dallas medical provider on April 10, 2020—two days before filing the grievance under review—but did not inquire about the KUB x-ray results. (Id.) Martin finished her grievance denial by stating, "If you are still having discomfort or would like to discuss your x-ray, you can sign up for sick call if you choose to do so." (Id.)

Martinez appealed the first-level denial to the Facility Manager—defendant Ransom. (See id. at 26). Ransom upheld the denial and addressed the additional concerns raised in the appeal regarding medical treatment that postdated Martinez's initial April 12 grievance. (Id.) Martinez's final appeal to the SOIGA was dismissed on procedural grounds on July 16, 2020, for failure to submit legible copies of both his initial grievance and his written appeal to final review. (Id. at 27).

Two conclusions can be drawn from this grievance history. First, Martinez never identified Ransom in any of his grievances as committing an act or omission that potentially violated the Eighth Amendment. Ransom's only involvement in the grievance process was in his role as Facility Manager for the second-level grievance review. Investigating and denying a grievance appeal that alleges inadequate care

12

by medical staff is not equivalent to being deliberately indifferent to a prisoner's serious medical needs.  See Alexander v. Gennarini, 144 F. App'x 924, 925 (3d Cir. 2005) (nonprecedential) (explaining that prisoner's claims against certain defendants were "properly dismissed" because the allegations against them "merely assert their involvement in the post-incident grievance process").  Martinez is not excused from administratively exhausting claims against Ransom—as required by the PLRA—simply because Ransom is the prison superintendent or Facility Manager who denied relief under DC-ADM 804.

Second, Martinez never exhausted any grievance against Martin.  His first grievance (number 724223) identified only a "Ms. Loretta" as providing deficient care.  And, as noted above, it is irrelevant to the claims in this case.  Martinez's second grievance (number 819297) did name Martin, but this grievance denial was not appealed to the Facility Manager, let alone to the SOIGA.  His third grievance (number 862879) named only an unidentified doctor—presumably Dr. Prince—and did not mention or involve Martin.  The omission of Martin is further confirmed by the fact that she was assigned as the grievance officer for initial review, which would have been prohibited under DC-ADM 804 if the grievance were leveled at or somehow involved Martin.  See DC-ADM 804 § 1(C)(3) ("The staff member who serves as the Grievance Officer shall not be directly involved in or named as the subject of the grievance[.]" (emphasis omitted)).

Martinez has not provided any basis to excuse his failure to exhaust administrative remedies against Martin and Ransom.  Consequently, summary

13

judgment must be granted in these defendants' favor on the procedurally defaulted Section 1983 claims against them. See Spruill v. Gillis, 372 F.3d 218, 222, 230 (3d Cir. 2004).

### B.   Eighth Amendment Medical Deliberate Indifference

Even if Martinez had not procedurally defaulted his Eighth Amendment claims against Martin and Ransom, the claims fail on the merits. In fact, Martinez's constitutional tort claims fail on the merits as to all three defendants.

The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishments on prisoners. See Farmer v. Brennan, 511 U.S. 825, 832 (1994). In the context of prison medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment" to incarcerated individuals. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). To establish an Eighth Amendment claim of deliberate indifference regarding inadequate medical care, a plaintiff must demonstrate (1) "a serious medical need," and (2) "acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).

Deliberate indifference by prison officials may be evidenced by intentional refusal to provide care known to be medically necessary, delayed provision of

medical treatment for non-medical reasons, denial of prescribed medical treatment, and denial of reasonable requests for treatment resulting in unnecessary suffering or risk of injury. See Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993) (quoting Lanzaro, 834 F.2d at 346). Deliberate indifference to serious medical needs is an exacting standard, requiring a showing of "unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (citation omitted). Claims sounding in mere medical negligence will not suffice. Rouse, 182 F.3d at 197.

None of the defendants dispute that Martinez has serious medical needs. Instead, they maintain that he has failed to establish deliberate indifference to those needs.

We begin with Ransom. Notably, Ransom's only connection to Martinez's medical treatment stems from his denial of Martinez's first appeal in grievance number 862879. But involvement in the grievance process alone does not give rise to Section 1983 liability. See Lewis v. Wetzel, 153 F. Supp. 3d 678, 696-97 (M.D. Pa. 2015) (collecting cases); Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (nonprecedential); Alexander, 144 F. App'x at 925. Martinez counters that Ransom should be held accountable under a theory of supervisory liability. He argues that Ransom was made aware—through the grievance appeal process—of the "substantial risk of harm" Martinez faced "based upon the inadequate medical treatment and mis-diagnosis of his serious medical condition" and failed to act. (Doc. 27 at 4). The problem with this argument is that it is not supported by any evidence.

15

As previously noted, only one grievance relevant to the case at bar was appealed to Ransom.  Ransom's well-reasoned and comprehensive response bears repeating in full:

> I have reviewed the above-noted grievance, the Grievance Officer's response and your subsequent appeal of said grievance.  My decision is as follows: CHCA Martin was assigned as grievance officer and has adequately addressed your grievance concerns[,] providing you with information regarding your medical treatment.  [The] Record indicates you were seen by Dr. Prince at [1:55 p.m.] on 5/6/20, there is no record you were seen on 5/16/20.  Regarding your assertion that the grievance officer said you didn't have any abnormal labs, but the ultrasound stated you had abnormal labs: Ms. Martin stated you were seen for abnormal labs.  Medical confirmed an ultrasound and labs are two different tests.  Medical also confirmed the abnormal labs and the KUB were not related and not in conjunction with one another.  Concerning Health Care officials did not do what they were suppose[d] to do during September 2019: these issues were addressed in grievance 819297.  Any grievance issue that has been or is currently being addressed will not be re-addressed in a subsequent grievance.  I would suggest you sign up for sick call to speak with a medical professional to discuss any issues you may have.  I find your grievance to be without merit; therefore, I uphold the initial response.  Your request for monetary relief is denied.  No inmate shall be punished, retaliated against, or otherwise harmed for use of the grievance system.

(Doc. 21-5 at 7).  In no way does this response evince deliberate indifference to serious medical needs.  Rather, it demonstrates that Ransom fully investigated Martinez's claims, spoke with Martin (the healthcare administrator) about the test results at issue, discussed with the medical department Martinez's additional concerns, and suggested that Martinez sign up for sick call to speak with medical staff if he was still having issues.  Martinez does not cite any other record evidence to support his claim against Ransom, (see Doc. 27 at 4-5, 10-11), and thus his assertion of supervisory liability is meritless.

16

Martinez's Eighth Amendment claim against Martin is equally without merit. It is undisputed that Martin is not a medical provider, but rather a healthcare administrator. (See Doc. 1-2 ¶¶ 19-20). Again, the only evidence to which Martinez cites regarding an alleged basis for supervisory liability is the grievance process. (See Doc. 27 at 4-5, 10-11). However, neither Martin's grievance responses nor the rest of the Rule 56 record demonstrates deliberate indifference.

Martinez named Martin in grievance number 819297. Yet, in Martinez's own words, he never appealed this grievance denial because "in [his] eye the matter was corrected." (Doc. 27 at 9). In grievance number 862879, Martin was assigned as the grievance officer. In her response, she explained the results of the March 26, 2020 KUB x-ray and that when test results are normal, no follow up is required. She also offered Martinez the option of signing up for sick call to discuss the x-ray if he desired. There is no deliberate indifference reflected in the relevant grievances.

The record also contradicts Martinez's claims of deliberate indifference against Martin. There is simply no evidence that Martin ever ignored a request from Martinez, failed to respond to a grievance, failed to investigate a healthcare-related issue brought to her attention, or committed any other act or omission evincing deliberate indifference to Martinez's serious medical needs. Martinez argues that a jury should determine whether Martin was deliberately indifferent, but he is mistaken. At the Rule 56 stage, he must proffer evidence sufficient to demonstrate that a jury reasonably could find in his favor such that there is a need

17

for trial.  See Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 192 (3d Cir. 2015) (quoting Liberty Lobby, 477 U.S. at 252) (alteration in original).  Martinez has not done so.

We turn to the final defendant, Dr. Prince.  Martinez has not responded in any way to Dr. Prince's motion for summary judgment.  Dr. Prince argues that the record clearly shows that there was no deliberate indifference to Martinez's medical needs.  We agree.

We need not repeat the lengthy recitation of Martinez's relevant medical treatment at SCI Dallas.  See supra, Section I.  The gravamen of Martinez's claim against Dr. Prince is that Dr. Prince failed to communicate, and act on, the results of the testing Martinez underwent in late 2019 and early 2020 for his kidney and bladder issues.  (See Doc. 1-2 ¶¶ 6-16, 29, 35, 46-48).  This assertion is belied by the record.  Martinez's medical records show that Dr. Prince promptly approved requests for diagnostic studies, prescribed medication and further testing to treat Martinez's ailments, and communicated test results to Martinez either on his own volition or when prompted by Martinez's sick-call requests.  The records likewise demonstrate that Martinez was seen by multiple other SCI Dallas medical staff during this time who also treated Martinez and responded to his concerns.

There was a period—from November 2019 to March 2020—where the medical records reflect an absence of treatment for kidney and bladder issues.  Martinez contends that this lack of treatment and failure to communicate demonstrates negligence on the part of SCI Dallas's medical department, although he has not proffered any evidence that he was suffering from symptoms during this time or

18

requested treatment and was ignored. Even when viewing the facts in a light most favorable to Martinez—and as he himself described the situation in his grievances, (see Doc. 1-2 at 19; Doc. 21-9 at 4)—this alleged absence of proactive medical management and communication infers only potential negligence, not deliberate indifference. And a showing of possible medical negligence is insufficient for an Eighth Amendment claim. Rouse, 182 F.3d at 197. We thus find that the factual record is devoid of evidence of "unnecessary and wanton infliction of pain" by Dr. Prince. Estelle, 429 U.S. at 104.

We make one additional observation. In his June 4, 2021 deposition, Martinez voiced complaints regarding continuing and new medical issues that occurred in late 2020 and early 2021. (See Doc. 21-2, Martinez Dep. 13:20-15:9, 17:13-18:15, 35:5-11; see also Doc. 24 ¶¶ 39-53). However, Martinez filed the instant lawsuit in August 2020. At no time thereafter did he amend his complaint or file a supplemental complaint under Federal Rule of Civil Procedure 15(d). Consequently, any issue regarding medical care (or lack thereof) that postdates the filing of his complaint is irrelevant to this lawsuit.

In sum, Martinez has not carried his Rule 56 burden to proffer evidence of deliberate indifference by any named defendant. Without such evidence, no jury reasonably could find in his favor, so we must grant defendants' motions for summary judgment on Martinez's Eighth Amendment claims. See Daniels, 776 F.3d at 192.

### C.   Medical Malpractice

Martinez never delineates his state-law claims of medical malpractice, although his intent to do so is explicit.  (See Doc. 1-2 ¶ 3 (stating that Martinez "is asserting a professional liability claim against" Dr. Prince); Doc. 1-3 at 6, 7 (certificates of merit for Martin and Dr. Prince for professional liability action as required by PA. R. CIV. P. 1042.3(a)); see also Doc. 29 at 2 ¶ 3).  Defendants do not address these claims in their Rule 56 motions or briefing.  Because we must grant summary judgment in defendants' favor on the Section 1983 claims over which we have original jurisdiction, we decline to exercise supplemental jurisdiction over Martinez's remaining state-law claims of medical negligence.  See 28 U.S.C. § 1367(c)(3).

## IV.   Conclusion

For the foregoing reasons, we will grant defendants' motions (Docs. 18, 22) for summary judgment with respect to Martinez's claims under 42 U.S.C. § 1983. We decline to exercise supplemental jurisdiction over the remaining state-law claims.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    January 19, 2022